**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 09-cv-01691-REB-CBS

NORTHLAND INSURANCE COMPANY,

      Plaintiff,

v.

CHRISTINA RHODES, individually and on behalf of the Estate of David Bates,
Deceased,
TIMASH INVESTMENTS, LLC, and
JOHN DOE, personal representative of Enoch Annor, Deceased,

      Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS**

---

**Blackburn, J.**

      This matter came before me for trial to the court on November 29-30, 2010.

Plaintiff, Northland Insurance Company, appeared through its attorneys, and defendant,

Christina Rhodes, appeared in person and through her attorney.  Defendant, Timash

Investments, LLC, has not answered or otherwise appeared in this action and did not

appear through counsel or otherwise at the hearing.  It appears that the John Doe

defendant has not been served.

      Having judicially noticed all relevant adjudicative facts in the file and record of

this case *pro tanto*; having considered the evidence educed in its various forms; having

determined the credibility of the witnesses; having weighed the evidence; having

considered the reasons stated, arguments advanced, and the authorities cited by the

parties; and being otherwise sufficiently advised of the facts and premises, I enter the

following findings of fact that are established by a preponderance of the evidence,

conclusions of law, and orders.[1]

## FINDINGS OF FACT

1.  The primary parties to this lawsuit are plaintiff, Northland Insurance Company (Northland), a Minnesota corporation, and defendant Christina Rhodes, individually and on behalf of the estate of David Bates (Bates), deceased, a Colorado resident.

2.  Bates and Enoch Annor (Annor) were hired as drivers by Timash Investments, LLC (Timash).  Stephen Agyei was the Operations Manager of Timash.  Alexander Aplerku owned the company.

3.  In January, 2008, Timash submitted an application for insurance to Northland. At the time, Timash listed a 2008 Volvo truck as the only vehicle to be covered by the policy.  (Trial Exh. 2.)  The Volvo was a "day cab," meaning that it did not have a sleeper compartment.

4.  The application noted that the Volvo's "maximum radius" from the Denver area was 500 miles. (Trial Exh. 2.)  Other applications for insurance submitted by Timash in February, 2008, stated that the company's business consisted of transporting shipments of groceries within Colorado not exceeding 300 miles from the Denver area. (*See* Trial Exh. 6 at COLLINS 00047; Trial Exh. 7 at COLLINS 00051.)

5.  The insurance premiums paid on a policy of motor carrier insurance such as that sought by Timash from Northland are based in part on and proportional to the maximum radius the covered vehicles are anticipated to travel from a defined location.

---

[1] I state my findings of fact specifically and conclusions of law separately as required by Fed. R. Civ. P. 52(a)(1).   Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

6.  Northland issued a commercial insurance policy, Policy No. TN593380, to Timash, effective from January 23, 2008, to January 23, 2009 (policy).  (Trial Exh. 1.)

7.  The policy provides coverage for "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (Trial Exh. 1 § II.A at NIC 00032.)

8.  The policy contains the following exclusions:

> This insurance does not apply to any of the following:
>
> . . . .
>
> 3. Workers' Compensation
>
> Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.
>
> 4. Employee Indemnification and Employer's Liability
>
> "Bodily injury" to:
>
> > a. An "employee" of the "insured" arising out of and in the course of:
> >
> > > (1) Employment by the "insured"; or
> > > (2) Performing the duties related to the conduct of "insured's" business; . . .
>
> . . . .
>
> 5. Fellow Employee
>
> > "Bodily injury to any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your

business.

(Trial Exh. 1 § II.B. at NIC 00034.)

9.   Under the express terms of the policy, "'[e]mployee' includes a 'leased worker.' 'Employee' does not include a 'temporary worker.'" (Trial Exh. 1 § VI.F. at NIC 00042.)  A "leased worker" is defined by the policy as "a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties relates to the conduct of your business."  (Trial Exh. 1 § VI.J. at NIC 00043.)  A "temporary worker" is "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions."  (Trial Exh. 1 § VI.Q. at NIC 00044.) Neither Bates nor Annor was a "leased worker" or a "temporary worker."

10.   The policy also contains an endorsement to coverage as follows:

RADIUS RESTRICTION

The premium for this policy is based on your telling us that certain "autos" will not be used for regular and frequent trips outside a 500 mile radius of the address stated in Item One of the DECLARATIONS.

X LIABILITY COVERAGE   X PHYSICAL DAMAGE COVERAGE
is changed by adding the following exclusion:

The following "autos" are not covered if used for regular and frequent trips outside the radius described above:
ALL COVERED AUTOS.

(Trial Exh. 1 at NIC 00053.)  The radius restriction was effective from the date of the issuance of the policy, January 23, 2008.

11.   Agyei's testimony that the 500-mile radius restriction shown on the application of insurance was a fabrication or alteration is not credible.  Timash

4

submitted applications for insurance to at least two other insurance companies in early 2008, both of which stated that the maximum radius traveled by Timash trucks was well less than 500 miles from Denver.  (Trial Exh. 6 at COLLINS 00047; Trial Exh. 7 at COLLINS 00051.)

12.  In 2008, the Volvo truck was used for regular and frequent trips to destinations more than 500 miles from the Denver area.   Agyei acknowledged that the Volvo drove regularly to California.  (**See, e.g.**, Trial Exhs. 21-29, 31, 34, 40- 41, 46-47, 49, 51-52, 54, 58, 63-64, 70, 76, 78, 80-82, 159, 171)  He testified also that the Volvo was used for other out-of-state trips.  (**See, e.g.**, Trial Exh. 20, 30, 32-33, 38, 42-45, 61-62, 65-66, 68, 137, 152.)  Indeed, there is no evidence that the Volvo was ever used to transport loads exclusively within Colorado.

13.  On August 4, 2008, Timash purchased a 2001 Freightliner tractor for use in its business.  The Freightliner had a sleeper compartment.  By virtue of a General Change Endorsement dated August 14, 2008, the Freightliner was added to the Northland policy.  (Trial Exh. 1 at NIC 00078-00078.)  The Freightliner was not leased.

14.  Agyei's testimony that the radius restriction was added subsequent to the effective date of the Northland policy to save money when Timash did not have a truck in operation is not credible.  There was never a point in time prior to the date of the subject accident in which Timash did not have at least one truck available to transport loads.

15.  Also not credible was Agyei's testimony that the radius restriction applied only to the Volvo, while the Freightliner was not subject to any such restriction.  The

radius restriction applied by its terms to "all covered autos."  The Freightliner was a "covered auto" to which the radius restriction applied.

16.   On August 7, 2008, Bates, while working for Timash, was involved in a single-vehicle accident while returning from California in the Volvo truck.  The Volvo was taken out of service for repairs.  Thereafter, Timash required Bates to drive the Freightliner with another driver.  Timash hired Annor to drive with Bates.  The drivers were to drive in four-hour shifts, alternatively using the Freightliner's sleeper compartment to rest.

17.   From August 7, 2008, to September 8, 2008, Bates and Annor transported four loads for Timash between Colorado and California.  (*See* Trial Exhs. 90, 91, 94, 95.)   All these trips were more than 500 miles from Denver.

18.   Had the Freightliner not been destroyed in the subject accident, it would have continued to make regular and frequent trips of more than 500 miles from the Denver area, as the Volvo had done prior to the August, 2008, accident.  Indeed, there would have been little purpose in purchasing a truck with a sleeper compartment other than to allow Timash drivers to travel more than a day's drive from Denver.

19.   Annor was hired by Timash pursuant to a Standard Employment Agreement/Contract (contract).  (Trial Exh. 14.)  Agyei gave Bates an identical contract at the time of his hire. Although Bates never returned an executed copy to Timash, Bates never objected to the contract generally or to any contract provision specifically. While at Timash, the terms of employment of Annor and Bates were identical.  In fact, Agyei testified that Timash considered both Annor and Bates to be working for it pursuant to the terms of the contract and that he informed Bates at the time he was

6

hired that the employment contract was "part of the deal." Both Timash and Bates intended to be bound by the terms of the contract.

20.   The employment contract specified that the driver would "render exclusive and full-time services in a driving capacity to Timash Investments" and would "devote his best efforts to the affairs of the Company and to perform such duties as Employee shall reasonable [sic] be directed to perform by officers of the Company."  (Trial Exh. 14 ¶ 1.1 at 1.)

21.   The contract required further that the driver would "not render any services for others, or for [his] own account . . . and [would] not render any services to any supplier or significant customer" of Timash.  (Trial Exh. 14 ¶ 1.2 at 1.)

22.   Under the terms of the contract, drivers were paid $.40 (40 cents) per mile per load.  Each driver was responsible for paying taxes on this compensation.  (Trial Exh. 14 ¶ 3.1 at 1.)  Timash did not withhold federal or state income or other taxes from Bates's pay.  (*See* Trial Exh. 15.)

23.   Bates was paid by Timash in his own name, not in the name of a company or other business entity.  (Trial Exh. 15.)  There was no evidence that Bates owned, operated, or was associated otherwise with a separate business entity.

24.   The contract provided that the driver would "be entitled to participate in any group insurance, qualified pension, hospitalization, medical health and accident, disability, or similar plan or program" of Timash following a ninety-day probationary period.  (Trial Exh. 14 ¶ 3.3 at 1.)  As of September 8, 2008, neither Bates nor Annor had completed the ninety-day probationary period.

25.   Agyei informed Bates and Annor that they would be responsible for securing

7

insurance for themselves.  Agyei explained that Timash's compensation rate of $0.40 per mile was set at $0.10 per mile more than the  industry average in order to allow drivers to purchase their own insurance.

26.  Agyei told Bates and Annor, with respect to insurance, that they were "covered while in the truck."  This meant that the truck was covered for liability and damage, not that Bates and Annor were covered by Timash's policy of insurance for injuries to themselves.

27.  The contract provided that Timash would reimburse "all necessary and reasonable expenses incurred or paid by Employee in connection with the performance of services under this Agreement[.]" (Trial Exh. 14 ¶ 3.2 at 1.)  Timash paid for and/or reimbursed drivers for tolls, fuel, scale charges, maintenance, and all other expenses incurred while transporting cargo for Timash.

28.  Drivers were required to keep detailed "trip packets," including logs, receipts, and similar indicia of their progress.  Agyei also maintained regular contact with the drivers while they were on the road.

29.  Although drivers did not have to accept any particular job, they would have been fired if they had refused to transport a load when requested to do so by Timash.

30.  Ageyi testified initially on direct examination that drivers were never allowed to transport loads for other trucking companies and did not have time to do so in any event.  On cross-examination, he asserted that Timash would not have precluded drivers from working for other companies so long as they did not use Timash trucks for that purpose.  Finally, on redirect examination, Ageyi averred again that drivers were not allowed to haul loads for other trucking companies.  I find his testimony on direct

and redirect examination credible and his testimony on cross-examination – that workers were not precluded from driving for other companies – incredible.  There is no evidence that Bates or Annor ever drove for any company other than Timash between the time of their hires and September 8, 2008.

31.  Agyei and Aplerku both testified that they considered their drivers to be "independent contractors."  Agyei testified that he told both Annor and Bates that they were "contractors" at the time they were hired.

32.  Agyei believed Annor and Bates were "contractors" because they were "under contract" with Timash and because Timash did not withhold taxes from their paychecks or provide insurance to them.  There was no testimony or other evidence to suggest that Ageyi or Aplerku were aware of any of the factors that commonly inform the definition of "independent contractor" under Colorado common or statutory law.

33.  However, neither Agyei nor Aplerku were competent to opine on the issue of "employee" versus "independent contractor" when characterizing the business relationship between Timash and Bates and Annor.

34.  On September 8, 2008, Bates and Annor were transporting a load from Colorado to California for Timash using the Freightliner.  The Freightliner was involved in a single-vehicle accident in Placer County, California.  Annor was driving and Bates was sleeping in the sleeper compartment at the time of the accident.  Both men were killed.

## CONCLUSIONS OF LAW

1.  I have jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity of citizenship).  All parties are citizens of different states and the amount in controversy

9

exceeds $75,000, exclusive of costs and interest.

2.   Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391.

3.   Colorado law controls my resolution of the substantive issues in this diversity case.  ***Erie Railroad Co. v. Tompkins***, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); ***Royal Maccabees Life Insurance Co. v. Choren***, 393 F.3d 1175, 1180 (10th Cir. 2005).

4.   In assessing the credibility of each witness who testified at trial, I have considered all facts and circumstances shown by the evidence that affect the credibility of the witness, including the following factors:  the witness's means of knowledge, ability to observe, and strength of memory; the manner in which the witness might be affected by the outcome of the litigation; the relationship the witness has to either side in the case; and the extent to which the witness is either supported or contradicted by other witnesses or evidence presented at trial.

5.   By its Amended Complaint, Northland seeks a declaration that the policy does not provide coverage for any liability of Timash related to Bates's death.  To recover on a declaratory judgment claim, Northland must establish that "'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  ***United States v. Fisher-Otis Co.***, 496 F.2d 1146, 1151 (10th Cir. 1974) (quoting ***Maryland Casualty Co. v. Pacific Coal & Oil Co.***, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). I find and conclude that his standard has been satisfied, and, therefore, it is appropriate

for this court to declare the rights and liabilities of the parties with respect to the subject

contract of insurance.[2]

6.   Northland relies on various exclusions of the policy to support its request for

declaratory relief.  It, therefore, bears the burden of proof to establish that these

exclusion are applicable.  *See American Automobile Insurance Co. v. Lifeco, Inc*.,

2009 WL 2475118 at * 4 (D. Colo. Aug. 11, 2009) (citing *Hecla Mining Co. v. New*

*Hampshire Insurance Co.*, 811 P.2d 1083, 1090 (Colo.1991)).

7.   The policy contains three exclusions that implicate "employees" of the

insured.  Specifically, coverage is excluded for (1) any obligation that Timash may be

liable to pay under any workers' compensation or similar law; (2) "bodily injury" to an

employee of Timash arising out of and in the course of Timash's business; and (3)

"bodily injury" to a fellow employee arising out of and in the course of Timash's

business.  For ease of reference, these will be referred to, respectively, as the workers'

compensation exclusion, the employee indemnification exclusion, and the fellow

employee exclusion.  Given these exclusions, the question whether Bates was an

employee of Timash, or alternatively, an independent contractor, is determinative of

Northland's declaratory judgment claim.

8.   Colorado courts have recognized that insurance policy exclusions for bodily

injury to employees in the course of their employment are enforceable.  *Western*

*Mutual Insurance Co. v. Wann*, 363 P.2d 1054, 1055 (Colo. 1961); *Canal Insurance*

---

[2]  The Declaratory Judgment Act is procedural rather than a substantive, and, therefore, it, rather than the Colorado state law counterpart, applies in this diversity case.  *Farmers Alliance Mutual Insurance Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir.), *cert. denied*, 99 S.Ct. 97 (1978).

*Co. v. Nix*, 7 P.3d 1038, 1040 (Colo. App. 2000).

9.  Northland urges me to adopt the reasoning of *Consumers County Mutual Insurance Co. v. P.W. & Sons Trucking, Inc.*, 307 F.3d 362 (5th Cir. 2002).  In that case, the appellate court considered a policy containing employee indemnification and fellow employee exclusions similar to those contained in the Northland policy.  *Id.* at 364 n.2.  As here, the insurer maintained that the injured driver was an employee of the insured trucking company, while the insured insisted that the driver was an independent contractor.  *Id.* at 364.

The Fifth Circuit Court of Appeals upheld the district court's conclusion that the driver was a "statutory employee" under the Motor Carrier Safety Act, 49 U.S.C. § 31501 *et seq.  Id.* at 364-65.  More specifically, the regulations interpreting the Act eliminate the common law distinction between employees and independent contractors:

> any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety.  Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle) . . .

49 C.F.R. § 309.5.  The court found that this definition was properly incorporated into the policy at issue:

> The policy at issue in this case is a public-liability policy designed specifically for use by motor carriers in the interstate trucking industry. Federal law requires motor carriers to procure at least a minimum level of public-liability insurance in order to obtain an operating permit.  The purpose of this insurance requirement is to ensure that a financially responsible party will be available to compensate members of the public injured in a collision with a commercial motor vehicle. Although the Motor Carrier Safety

> Act places an affirmative insurance obligation on motor carriers with respect to the public, it does not require motor carriers to obtain coverage for "injury to or death of [their] employees while engaged in the course of their employment."

*Consumers County*, 307 F.3d at 365-66 (internal citations omitted).  Northland posits that since its policy also "was drafted to comply with federal insurance requirements," *id.* at 366, it also should be read to incorporate this broad definition of the term "employee."

I am not persuaded.  Initially, I note that, unlike the Northland insurance policy, the policy in *Consumers County* did not define the term "employee."  *See id.* at 364 n.2.  The primary goal of contract interpretation is to give effect to the intention of the parties.  *Theriot v. Colorado Association of Soil Conservation Districts Medical Benefit Plan*, 38 F.Supp.2d 870, 876 (D. Colo. 1999) (citing *Cache National Bank v. Lusher*, 882 P.2d 952, 957 (Colo.1994)).  Here, the parties defined for themselves, at least in part, who would be considered an employee and who would not.

Granted, as Bates was neither a "leased worker" nor a "temporary worker" as defined by the policy, the definition is of little help in the circumstances of this case.  Nevertheless, the fact that the contract includes such a definition suggests that, regardless of the overarching purpose of the contract, the parties did not specifically intend to incorporate the regulatory definition of "employee" into the policy.

I am further convinced that this policy cannot be interpreted to incorporate that definition by virtue of the fact that it elsewhere specifically refers to and/or incorporates various other specific sections of the Motor Carrier Safety Act and its regulations.  (*See,*

*e.g.*, Trial Exh. 1 at NIC 00065-00066, 00069.)  This suggests that the parties knew how to manifest their intent to incorporate various provisions of the federal statute and its regulations where applicable.  Under the doctrine of *expressio unis est exclusio alterius*, the fact that they chose not to make specific reference to the expansive definition of "employee" set forth in 49 C.F.R. § 390.5 strongly suggests that the definition was not intended to be incorporated in the policy.

10.  The question, therefore, is whether Bates was an employee or an independent contractor.  Rhodes argues that the factors set forth in Colorado workers' compensation statute suggest the latter.  *See* §8-40-202(2), C.R.S.  I am not convinced that reliance on this statute is wholly warranted.  Nevertheless, because the statutory factors distinguishing an employee from an independent contractor are similar to those considered under the common law test,[3] and because Northland analyzes these factors

---

[3]  "Under the common law, the most important factor in determining whether a worker qualifies as an employee is the alleged employer's right to control the details of performance."  *Norton v. Gilman*, 949 P.2d 565, 567 (Colo. 1997).  The relevant, but non-exhaustive, list of factors that may be considered include:

> (1) the extent of control that, by the agreement, the employer may exercise over the details of the work;
> (2) whether or not the worker is engaged in a distinct occupation or business;
> (3) whether the work, in the locality, is usually done under the direction of the employer or by a specialist without supervision;
> (4) the skill required in the particular occupation;
> (5) whether the employer supplies the instrumentalities, tools, and the place of work;
> (6) the length of time for which the worker is employed;
> (7) the method of payment, whether by the time or by the job;
> (8) whether or not the work is a part of the regular business of the employer;
> (9) whether or not the parties believe they are creating the relation of master and servant; and
> (10) whether the employer is or is not in business.

*Henisse v. First Transit, Inc.*, 220 P.3d 980, 986 n.1 (Colo. App. 2009) (citing RESTATEMENT (SECOND) OF AGENCY § 220 (1958)), *cert. granted on other grounds*, 2009 WL 4759875 (Colo. Dec. 14, 2009) (No. 09SC626)

in its own briefs, I will use them as a template for analysis here.

The Colorado workers' compensation statute provides that

> any individual who performs services for pay for another shall be deemed to be an employee, irrespective of whether the common-law relationship of master and servant exists, unless such individual is free from control and direction in the performance of the service, both under the contract for performance of service and in fact and such individual is customarily engaged in an independent trade, occupation, profession, or business related to the service performed.

§8-40-202(2)(a), C.R.S.  The statute lists a number of factors that may be considered in establishing independence.  To show independence, it must be established that the person for whom services are rendered does not

> (A) Require the individual to work exclusively for the person for whom services are performed; except that the individual may choose to work exclusively for such person for a finite period of time specified in the document;

> (B) Establish a quality standard for the individual; except that the person may provide plans and specifications regarding the work but cannot oversee the actual work or instruct the individual as to how the work will be performed;

> (C) Pay a salary or at an hourly rate instead of at a fixed or contract rate;

> (D) Terminate the work of the service provider during the contract period unless such service provider violates the terms of the contract or fails to produce a result that meets the specifications of the contract;

> (E) Provide more than minimal training for the individual;

> (F) Provide tools or benefits to the individual; except that materials and equipment may be supplied;

> (G) Dictate the time of performance; except that a completion schedule and a range of negotiated and mutually agreeable work hours may be established;

15

(H) Pay the service provider personally instead of making checks payable to the trade or business name of such service provider; and

(I) Combine the business operations of the person for whom service is provided in any way with the business operations of the service provider instead of maintaining all such operations separately and distinctly.

*Id.* §8-40-202(2)(b)(II)(A) - (I), C.R.S.

Contrary to Rhodes's argument, there is no presumption of independent contractor status under the Colorado workers' compensation statute.  Indeed, if anything, the structure of §8-40-202(2) supports the opposite conclusion.  Rhodes's reliance on ***USF Distribution Services, Inc. v. Industrial Claim Appeals Office of the State of Colorado***, 111 P.3d 529 (Colo. App. 2004), ***cert. denied***, 2005 WL 1140424 (Colo. May 16, 2005), in support of her argument is misplaced.  That case discusses presumptions applicable to lease agreements between motor carriers and independent contractors.  *Id.* at 531 (citing § 40-11.5-102, C.R.S.).  There was no lease involved in this case.

I find and conclude that Bates was not sufficiently free from the control and direction of Timash in the performance of his duties on behalf of Timash to be considered an independent contractor.  Although several of the relevant factors suggest a degree of independence in the performance of Bates's duties for Timash, and not all are relevant to the facts of this case, on balance, they show a relationship more in the nature of an employee than that of an independent contractor.

11.  Although Bates did not execute an employment contract with Timash, it is clear that his relationship with Timash was intended to be and was, in fact,

circumscribed in the manner set forth in the contract he was given.

12.   The contract requires drivers to "render exclusive and full-time services" to Timash.  (Trial Exh. 14 ¶ 1.1 at 1.)  Drivers may "not render any services for others, of for [their] own account."  (Trial Exh. 14 ¶ 1.2 at 1.)  Agyei's testimony on this point, although somewhat conflicting, on balance supports the conclusion that drivers were to devote themselves to Timash's business full-time and were not free to work for others.

13.   Bates was paid by the mile, not at a fixed or pre-contracted rate per trip or load. He also was paid in his own name and not in the name of a separate business entity.  (Trial Exh. 15.)  Indeed, there was no evidence suggesting that Bates owned or operated such a business.

14.   Timash owned the trucks that Bates used in transporting loads on behalf of the company.  Timash paid all expenses related to each trip, including tolls, fuel, lodging (where applicable), maintenance, scale charges, and the like.  Drivers were required to keep detailed "trip packets," including logs, receipts, and similar indicia of their location and progress.  Agyei also maintained regular contact with the drivers while they were on the road.  Timash, thus, exercised significant control and oversight of its drivers.

15.   Bates did not dictate the time of performance of his duties.  Rather, Timash alerted him when jobs were available.  Although theoretically he could have declined to drive on any particular trip, Agyei affirmed that, had Bates done so without sufficient justification, he would have been fired.

16.   Evidence of Timash's agreement's with its freight broker, Houg Special Services, demonstrates that each trip was anticipated to be made within a specified period of time within a specified mileage.  (Trial Exhs. 70, 76, 78, 80, 81, 82.)  Drivers

were provided with GPS units in order to map out routes for their trips.  They had limited discretion in choosing the route or otherwise deviating from that suggested by the GPS unit.  Nevertheless, given that they were paid by the mile and not by the trip, it would be unreasonable to conclude that drivers could deviate substantially from the estimated mileage for the trip or otherwise reach the destination by some unnecessarily circuitous and inefficient route.

17.  To be sure, some of the relevant factors suggest a degree of independence. for example, Bates received no training from Timash.  However, given that Timash was a small, nascent business, it makes sense that it would seek to employ experienced drivers.  This factor, therefore, has little impact on the analysis.

18.  Likewise, the fact that the employment agreement contemplated that drivers could not be fired after the probationary period except for cause does not suggest independence in the context of this case.[4]  Indeed, the fact that the contract contemplated a probationary period, after which certain additional benefits and protections would become applicable, in itself suggests that the anticipated relationship was an ongoing one of employer and employee.

19.  The fact that Timash, speaking through Agyei and Aplerku, conceived of or referred to Bates as an independent contractor is largely irrelevant.  Indeed, were employers permitted to define the nature of their relationship with their workers merely by affixing self-serving labels, there would be little reason for a totality-of-the-circumstances-type test such as has developed in the common law and is manifested in

---

[4]  Where Rhodes elsewhere seeks to disavow that Bates was subject to the contract, in this respect she seeks to rely on the contract.  She cannot have it both ways, however.

the workers' compensation statute.  *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947).  Although Timash may have intended that its drivers be independent contractors, the way in which it treated them demonstrates that they were so in name only.

Moreover, both Agyei and Aplerku testified that they considered the drivers to be independent contractors because Timash did not pay taxes on their wages or pay for insurance for them.  Neither of these considerations, however, is among the relevant factors under either the statutory or the common law test. In the end, neither Agyei nor Alerku were competent to opine as they did.

20.  For these reasons, I find and conclude that whether determined under §8-40-202(2), C.R.S., or Colorado common law, Bates was an employee of Timash within the meaning of the policy.  Accordingly, coverage for any liability of Timash related to Bates's death is excluded pursuant to the workers' compensation exclusion, the employee indemnification exclusion, and the fellow employee exclusion of the Northland policy.

21.  Moreover, and even if these exclusions were not applicable, it is clear that the radius restriction also operates to exclude coverage for the subject accident under the policy. The Freightliner was a "covered auto" to which the radius restriction applied. Agyei's testimony that the restriction was intended to apply only to the Volvo truck was not credible.  The endorsement to the policy plainly provides otherwise.[5]  Moreover, the

---

[5]  Rhodes suggest that the Freightliner cannot be a covered auto because it does not appear on the face of the policy is specious, and ultimately unhelpful to her in any event.  The endorsement adding the Freightliner to the coverage of the policy plainly states that it is intended to be part of the policy.  If it were not, then the policy would not apply to the Freightliner at all, and there still would be no coverage for the subject accident.

Volvo itself was used for regular and frequent trips outside the radius.

Each of the admittedly limited number of trips made in Freightliner was to a destination outside the 500-mile radius.  This fact, coupled with Timash's historical use of the Volvo truck, supports my conclusion that, had it not been irreparably damaged in the fatal accident, the Freightliner would have continued to be used for regular and frequent trips outside the radius.  I refuse Rhodes's implicit suggestion to ignore this historical perspective on Timash's use of its trucks simply because the Freightliner was in service less than a month before the accident.[6]

The policy's reference to "regular and frequent trips outside the radius" is not ambiguous.  In making this argument, Rhodes conflates the distinct concepts of ambiguity and indeterminateness.  "A term is ambiguous if it is susceptible to more than one reasonable interpretation."  **Warren v. Liberty Mutual Fire Insurance Co.**, 691 F.Supp.2d 1255, 1265 (D. Colo. 2010) (citing **Hoang v. Assurance Co. of America**, 149 P.3d 798, 801 (Colo. 2007)).[7]  "Regular" and "frequent" are not ambiguous in this relevant sense.  Instead, if anything, the terms are indefinite because their meaning must be ascertained by reference to Timash's normal course of business.  **See Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.**, 57 P.3d 738, 375 (Colo. App. 2002) (indefiniteness in contract term "may be cured by subsequent performance").

Considering that relevant context, it is clear that Timash's trucks were used for

---

[6]  My determination in this regard is further buttressed by the fact that Timash purchased the Freightliner specifically because it had a sleeper compartment.  Timash, thus, clearly anticipated that the truck would be used for trips beyond the 500-mile radius.

[7]  In fact, contrary to the arguments of Rhodes, none of the policy provisions was ambiguous.

regular and frequent trips outside the 500-mile radius.  Timash engaged in no business other than transportation of cargo by truck.  Its trucks, therefore, were used regularly, indeed, exclusively, not simply as an occasional corollary to its business.  The evidence presented to the court confirmed further that the majority, if not the entirety, of Timash's business involved destinations outside a 500-mile radius from the Denver area.  There, thus, can be no doubt that such trips were regular and frequent within the context of Timash's business.

22.  Nor has Northland waived its right to assert these exclusions by virtue of having previously paid some expenses related to the accident.  The doctrines of waiver and estoppel will not create coverage where none exists under the clear terms of the policy.  ***Empire Casualty Co. v. St. Paul Fire and Marine Insurance Co.***, 764 P.2d 1191, 1198 (Colo. 1988).  Rhodes's suggestion that her arguments in this regard were meant to explain and define the parties' reasonable expectations is a non-starter.  The reasonable expectations of the parties are relevant, if at all, only in ascertaining what they intended as of the time of contracting.  They have no application in the context of entitlement to benefits, when an insured can have no reasonable expectation of receiving benefits expressly excluded from the policy.

### III.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That plaintiff Northland Insurance Company's claim for declaratory judgment is **RESOLVED** by the court's construction of the policy of insurance issued by Northland to Timash Investments, LLC, to exclude coverage for any liability of Timash

Investments, LLC, to David Bates or his estate, personal representative, heirs, or devisees based on the accident of September 8, 2008; and

2.  That by **Friday, December 24, 2010**, plaintiff Northland **SHALL FILE** a status report informing the court of its intentions with respect to its claims against Timash Investments, LLC, and the John Doe defendant; provided, furthermore, that any motion related to such claims **SHALL BE FILED** by that same date, otherwise these defendants and the claims against them may be dismissed.

Dated December 9, 2010, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge

22